IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-00305-RBJ

ALIA REGINA GRIMM,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

     Defendant.

---

## ORDER

---

This matter is before the Court on review of the Social Security Administration ("SSA")
Commissioner's decision denying claimant Alia Regina Grimm's application for social security
disability insurance ("SSDI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons
explained below, the Court reverses the Commissioner's decision and remands the case for
further consideration.

## STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical
and/or mental impairments preclude her from performing both her previous work and any other
"substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2). To be
disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work
for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing
a final SSA decision, the District Court examines the record and determines whether it contains

substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## BACKGROUND

### A. <u>Factual Background</u>

Alia Grimm is a young woman who was injured in a motor vehicle accident on October 10, 2013. Prior to her accident, Ms. Grimm worked as a massage therapist. After her accident, she attempted to return to work but realized that working exacerbated her conditions. She has not worked since early 2014. R. 19.

Immediately following her accident, Ms. Grimm was diagnosed with injuries to her back and left knee. R. 611–17. Ms. Grimm was also pregnant at the time, preventing the hospital from conducting a full range of imaging. In the days following her accident, Ms. Grimm experienced migraine headaches, neck pain, and back pain, sternum pain, depression, and difficulty sleeping. R. 272–279, 1067.

Ms. Grimm began treatment with Dr. Bethany Wallace, who diagnosed her with temporomandibular joint dysfunction (TMJ); cervical, thoracic, and lumbar strain; hand pain;

patellar bone bruise; muscle spasms; and otalgia.  R. 412–14.   Dr. Wallace recommended Ms. Grimm stop work because it aggravates her conditions, suggesting she needed "sedentary" work that would allow her to change positions as needed.  Ms. Grimm was prescribed physical therapy, massage therapy, acupuncture, and chiropractic therapy, and was referred to a TMJ specialist and for an MRI.  *Id*.  Ms. Grimm began to see Josh Vickers, chiropractor, who noted that she showed signs of a concussion as well as "obvious signs of distress."  R. 687–89.

Ms. Grimm's MRI showed that she had posterior disc bulging in multiple locations as well as an annular fissure of her C5–6 vertebrae with "slight effacement of the ventral cerebral spinal fluid and cord flattening."  R. 408–09.  Ms. Grimm reported to Dr. Wallace difficulty completing tasks and Dr. Wallace recommended she break tasks into smaller steps and take breaks in order to complete them.  R. 423.

By March of 2014, Ms. Grimm's headaches had decreased in frequency but were extremely intense and long-lasting.  R. 1131–45.  Her concussion symptoms remained, including forgetfulness.  She continued to have tenderness of her paraspinal muscles and flattening of the thoracic kyphosis.  R. 427–28.   By April of 2014, her symptoms persisted, and she began to have anxiety while riding in cars, including flashbacks to her accident.  R. 430–31.  Her symptoms continued through her childbirth in May 2014, after which she experienced several post-partum complications.  R. 1220–32.

In June and July of 2014, Ms. Grimm experienced some improvement in her ability to walk, and improvement to other symptoms following chiropractic treatments.  However, her migraines, joint pain, anxiety, and tenderness continued.  She also experienced visual symptoms and anxiety while riding in cars and continued to avoid driving out of safety concerns.  Dr. Wallace referred her for continued physical therapy, acupuncture, and chiropractic therapy, as

well as vestibular therapy, cranial sacral therapy, and psychotherapy.  R. 433–34; 393–97.  She experienced difficulty performing activities of daily living and dizziness while riding in cars, as well as severe headaches and neck pain.  R. 437–56.  Ms. Grimm began seeing TMJ specialist Kevin Berry, DDS, who diagnosed her with auriculotemporal neuralgia, cervical muscle spasm, myalgia, and post-traumatic headaches.  R. 680.  He prescribed maxillary craniomandibular orthotic therapy.  R. 663–64.

In September of 2014 Ms. Grimm experienced some improvements, but still struggled with headaches, irritability, anxiety while riding in cars, and depression.  R. 381–85.  She was referred to a neurologist, Dr. Patricia Soffer, to whom she reported memory loss, cognitive difficulties, depression, and anger issues.  R. 314–16.  Ms. Grimm reported difficulty finding work, remembering days of week, and finishing tasks.  *Id.*  She had limited range of motion in her cervical spine, but had a negative Tinel's sign and scored 29 out of 30 on a mini-mental status examination.  Dr. Soffer found she was alert, fluent, and normally conversant with no dysarthria or dysphasia.  *Id.*  She was diagnosed with a closed head injury with headaches and cognitive difficulties, post-traumatic cervical and lumbar spine sprains, bilateral upper extremity numbness and pesthesia, and carpel tunnel.  *Id.*

One year after the accident she continued to have concussion symptoms including light sensitivity, nausea with head and eye movement, difficulty focusing her eyes, short-term memory loss, and word placement, balance, depth perception and understanding difficulties.  R. 476–78.  She also continued to experience numbness in her legs, anxiety riding in cars, and irritability.  *Id.*  Her psychotherapist, Dr. Joan Laub, noted that she was overwhelmed and angry with her lack of recovery, hypersensitive to loud noises and sudden movements, and that the activities of daily living challenged her.  R. 621–29.  Dr. Laub diagnosed her with post-traumatic

stress disorder and severe major depressive disorder. She concluded that Ms. Grimm could not work. *Id*.

Ms. Grimm also struggled to complete neuropsychological testing because of her headaches, and Dr. Dennis Helffenstein, a neuropsychologist, noted her elevated Beck depression inventory score. R. 346–52. Dr. Helffenstein concluded that, due to effects of her post-concussive syndrome and traumatic brain injury, this was best interpreted as showing mild to moderate depression. *Id*. She also met the diagnostic criteria for PTSD, demonstrated a verbal fluency deficit, significant dizziness, photophobia, and developed a severe migraine while attempting testing. *Id*. She was diagnosed with mild traumatic brain injury, severe concussion, mild to moderate depression, irritability and reduced stress tolerance, and PTSD. *Id*.

Dr. Daniel Bennett, a pain management specialist, found Ms. Grimm had positive signs of thoracic outlet syndrome, reduced range of motion in her cervical spine with facet referral patterns and trigger points, quadratus irritation, positive piriformis signs, and pseudociatic response in her right leg. R. 328–31. He recommended staged facet joint blocks in her cervical and lumbar spine. *Id*. Around this time, Ms. Grimm reported to her providers that her attempts to increase activity "wipes me out for a day or so." R. 771.

In January of 2015 Ms. Grimm reported lessened fatigue and concentration difficulty, but continued difficulty with tasks requiring cognitive skills or organization. R. 483–84. She was unable to complete daily living activities without experiencing exhaustion and vertigo. Dr. Wallace found that her visual perception was quite deficient. *Id*. Dr. Wallace concluded that due to her visual processing deficits, it was unsafe for Ms. Grimm to drive and she was not able to return to work. *Id*. Shortly after, Ms. Grimm underwent lumbar and cervical facet injections, which provided some relief to her back pain. R. 325–27.

In March 2015 Ms. Grimm had a radiofrequency neurolysis of her cervical spine nerves, from which Dr. Bennett concluded she had occipital headache caused by probable nerve entrapment; facet injuries at C5-6 and 6-7 vertebrae with referred pain (in remission after the procedure); thoracic outlet syndrome (which was improving); facet injury pain at L4-5 and L5-S1 (also in remission); piriformis syndrome with pseudosciatica (beginning to resolve). He recommended continued neurolysis, EMG-guided anesthetic injection, and an occipital nerve block for her headaches. R. 322–24.

She continued vestibular physical therapy, chiropractic therapy, and underwent neurocognitive linguistic assessments with a speech language pathologist, Susan Tauger. R. 1316–31, 827, 941. The testing showed Ms. Grimm had severe impairments in functional processing, expressive language, short term visual memory, memory for sentences, delayed recall of words, recall of targeted words, and numbers. R. 941–46. Ms. Tauger also noted deficits in pragmatic communication, turn-taking, verbosity, topic maintenance, organization, completeness of dialogue, sentence structure, and spelling. *Id.* Ms. Tauger provided Ms. Grimm recommendations for how to complete tasks and communicate with her husband, including writing the last thing she did while attempting to cook, placing backup housekeys throughout the house, etc. R. 939–40.

In April 2015, Ms. Grimm again attempted to complete neuropsychological testing, and continued to report headaches; concussion symptoms including noise and light sensitivity, difficulty with depth perception, attention and concentration; and short-term memory. R. 353–56. Dr. Helffenstein noted speech errors, and difficulty with language and reading comprehension, spelling and problem solving, information processing, and decision-making. *Id.* She still received an elevated Beck depression score and clinically significant PTSD score. *Id.*

Ms. Grimm also saw Dr. Richard Stieg, who found she had shoulder tenderness, positive piriformis sign, and TMJ tenderness. He also found proximal leg weakness, hyperactive reflexes, post-concussive syndrome with cognitive and visual disturbance, migraine headaches with aura, and multifocal myofascial pain syndrome. R. 877–85. She then saw Dr Manniko, who diagnosed her with convergence insufficiency, vertical disparity, lowered amplitude of accommodation, and exphoria. He prescribed her prism lenses to reintegrate her impacted senses, but she had difficulty tolerating them. R. 1312.

In June of 2015 Ms. Grimm reported reduced passenger anxiety with the use of ear plugs. R. 873–74. She also reported episodes of "blanking out," problems keeping track of her belongings, depression, suicidal thoughts, difficulty performing daily activities, especially after her husband returned to work, as well as memory, attention, concentration, and vision difficulties. R. 873–74; 534. Dr. Laub noted her agitation and distress, and that she was still symptomatic.

In July of 2015 Ms. Grimm broke her hand when she was hit by softball while in a batting cage. R. 1265–74. She expressed trouble accepting and adjusting to her limitations, and she experienced fatigue after any activity. R. 638. She still had severe TMJ pain and could not afford some of the recommended treatments. R. 870. Ms. Grimm also continued to have visual difficulty, but reduced headache frequency. Dr. Stieg found she had trouble looking up, transient upbeat nystagmus in both eyes, and slight oscillopsia, and he recommended a brain MRI due to her continued cognitive difficulties. *Id.*

Shortly after Ms. Grimm saw Dr. Lynn Hellerstein, a neuro-optometrist. Dr Hellerstein performed several tests, finding Ms. Grimm's memory and sequential memory to be below the first percentile. R. 893. She also found Ms. Grimm showed eye-movement control difficulty,

functional tunnel vision, and decreased visual fluency, with only 70% comprehension.  R. 893–94.  She was diagnosed with photophobia, constricted visual fields, convergence insufficiency, suppression of binocular vision, accommodative insufficiency, vision/motor sensitivity, mildly reduced visual acuity in the left eye, and spasms and pain with ocular movement with left gaze.  *Id*.  Dr. Helffenstein recommended more assessments, glasses for light sensitivity, vision rehabilitation therapy, neuropsychiatric testing, chiropractic therapy, and vestibular evaluation.  She also expressed concern about Ms. Grimm's safety engaging in hazardous activities like driving and noted that Ms. Grimm had retained "only a fraction of available fields to make visual decisions."  *Id*.

In September 2015 she underwent vestibular tests which indicated that the cause of her balance and dizziness was most likely her post-concussive syndrome.  R. 900–26.  She continued vestibular and physical therapy through that fall but was unable to engage in normal activities, and her physical therapist recommended that she avoid activities that would overstimulate her, such as viewing Christmas lights.  R. 972–73; 975–76.

Later that fall, she was diagnosed with lumbosacral radiculopathy, right sided sciatica, right piriformis muscle spasm, cervical radiculopathy, and history of traumatic brain injury.  R 1285–86.  She was referred again to a neurologist, physical therapist, acupuncturist, and speech language pathologist.  *Id*.  She underwent visual field testing showing moderate traumatic brain injury.  R. 1375.

She finally completed neuropsychological testing in January 2016 and had a full-scale IQ score of 102, but she showed organic mental and executive dysfunction.  R. 955–69.  She met the diagnostic criteria for mild traumatic brain injury and severe concussion and Dr. Helffenstein noted that her cognitive difficulties had impacted her daily activities.  *Id*.  He also found

extensive impairments, particularly in the area of memory. R. 959–64. At this visit, Dr. Helffenstein also noted that because Ms. Grimm's accident had occurred two years prior, "she has therefore reached the maximum medical improvement from a neuropsychological standpoint and the deficits noted on testing are considered to be permanent." R. 967. In Dr. Helffenstein's opinion as both a "neuropsychologist and a vocational expert" Ms. Grimm's "vocational functioning has been significantly compromised," and "she may well be totally and permanently disabled from competitive employment." R. 968.

In March 2016 Dr. Helffenstein reviewed her medical records and concluded that her condition had not improved. R. 1489–92. He drew similar conclusions in January of 2017. R. 1517–20. Later in 2016, Ms. Grimm attended physical therapy and reported inability to engage in any activity without increased pain. R. 1499.

**B.  Procedural Background**

Ms. Grimm completed her application for Title II Social Disability Insurance ("SSDI") on May 29, 2015. R. 152–53. After SSA denied her initial application on February 22, 2016, she requested a hearing which was held before ALJ Jamie Mendelson on October 17, 2017. R. 39–65. An impartial vocational expert testified at the hearing, and Ms. Grimm was represented by counsel. *Id*. The ALJ issued an unfavorable decision on February 9, 2018. R. 14–31. Ms. Grimm then asked the Appeals Council to review the decision, and her request was denied on December 11, 2018, making the ALJ decision final. R. 1–7.

Ms. Grimm filed a timely complaint and petition for review in this Court on February 4, 2019. ECF No. 1. On May 15, 2019 she submitted an opening brief arguing that the ALJ failed to properly evaluate her limitations at steps three, four, and five, gave improper weight to medical and third-party sources, and incorrectly assessed the consistency of her allegations. ECF

No. 16.  The Commissioner responded to Ms. Grimm's brief, ECF No. 17, and Ms. Grimm filed a reply, ECF No. 18.  This appeal is now ripe for review.

## C.  ALJ's Decision

After evaluating the evidence of Ms. Grimm's alleged disability according the SSA's standard five-step process, the ALJ issued an unfavorable decision.  R. 14–31.  At step one, the ALJ found that Ms. Grimm had not engaged in substantial gainful activity.  R. 19.  At step two, the ALJ found that Ms. Grimm had the following severe impairments: TMJ dysfunction, thoracic outlet syndrome, post concussive syndrome, migraines, mild neurocognitive disorder, depressive disorder, and posttraumatic stress syndrome.  R. 20.  At step three, the ALJ determined that Ms. Grimm's impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

At step four, the ALJ found that Ms. Grimm had a Residual Functional Capacity ("RFC") to perform light work as defined by 20 CFR 416.967(b).  Specifically, she could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds or balance on narrow, slippery, or erratically moving surfaces.  R. 22.  She could occasionally stoop, kneel, crouch, and crawl.  She could not operate vibrating machinery and could not be exposed to hazards such as unprotected heights or heavy machinery.  She required the ability to wear shaded glasses in bright light environments.  She could tolerate a moderate noise environment.  She could understand, remember, and carry out simple and routine tasks.  The claimant could tolerate occasional changes in routine work duties and tasks and could tolerate occasional interaction with co-workers and the public.  *Id*.

In reaching this conclusion, the ALJ gave significant weight to the opinion of state agency medical consultant Dr. Anthony Bianchi, who did not examine Ms. Grimm, and concluded that Ms. Grimm could perform light work. R. 28. The ALJ also assigned great weight to the opinion of state agency psychological consultant Dr. Ellen Ryan, who also did not examine Ms. Grimm, and concluded that Ms. Grimm had mild restrictions in activities of daily living, moderate difficulty with social functioning, moderate difficulty with concentration, persistence, and pace, and no episodes of decompensation. *Id.* Dr. Ryan also concluded that Ms. Grimm could do work of limited complexity requiring up to three months' time to learn and could interact with supervisors, co-workers, and the public if the contact was not frequent or prolonged. *Id.*

The ALJ gave little weight to the opinion of Dr. Bethany Wallace, who found that Ms. Grimm was limited to sedentary work and needed the ability to change positions. R. 27. The ALJ found that Dr. Wallace's opinion inconsistent other evidence. Specifically, the ALJ cited Dr. Soffer's finding that Ms. Grimm had "normal strength, sensation, and reflexes, a normal gait, and normal finger to nose and rapid alternating movements;" that Ms. Grimm reported that overall, she was significantly better in December of 2014; that she reported being able to take long walks, that she reported hitting softballs in a batting cage in July of 2015; and that on May 2016 she reported doing much better overall and was very happy with her progress. *Id.*

The ALJ gave little weight to the opinion of Dr. Dennis Helffenstein, who concluded Ms. Grimm's vocational functioning had been significantly compromised by the accident, and that she may be totally and permanently disabled. *Id.* The ALJ found Dr. Helffenstein's inconsistent with Dr. Soffer's finding that Ms. Grimm was alert, fluent, and normally conversant; Ms. Grimm's score of 29 out of 30 on the mini mental status exam; that in 2015 Ms. Grimm reported

her memory, reading performance, comprehension, and recall of information were beginning to improve.  *Id*.  The ALJ also pointed out Dr. Helffenstein's own finding that Ms. Grimm had a full-scale IQ of 102, which falls into an average range.  *Id*.  She also noted Ms. Grimm's attendance at her daughter's birthday party and her report that she was thinking more quickly.  *Id*.  The ALJ also noted that the issue of disability is reserved to the commissioner.  *Id*.

The ALJ gave little weight to the opinion of Dr. Lynn Hellerstein, who found in 2016 that Ms. Grimm had made some progress but was still unable to drive, read, or work.  R. 28.  The ALJ found this conclusion inconsistent with Ms. Grimm's significant improvement in visual field testing and her reported improvement in her headaches and balance.  *Id*.

At step five, the ALJ found that considering Ms. Grimm's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  R. 30.  Specifically, through the testimony of a vocational expert, the ALJ found that Ms. Grimm could perform the positions of "marker," "housekeeping cleaner," and "mail clerk."  *Id*.

Ms. Grimm asserts that the ALJ incorrectly assessed the consistency of Ms. Grimm's statements with medical evidence.  ECF No. 16 at 6.  She asserts that at step three, the ALJ should have found that she met the criteria for several listings.  Next, she asserts that the ALJ improperly weighted the opinions of both Ms. Grimm's medical providers and third-party sources such has her home care provider.  Ms. Grimm also asserts the ALJ failed to include limitations related to Ms. Grimm's impairments when calculating her RFC.  Finally, she asserts that at step five, the ALJ cited occupations that cannot be performed within the limitations of her RFC.  *Id*. at 7.

## ANALYSIS

### A.  <u>Consistency of Ms. Grimm's Statements</u>

The ALJ found that Ms. Grimm's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  R. 26.  Ms. Grimm challenges the basis for the ALJ's conclusions, arguing that, "in context" with the rest of her medical history, the ALJ's cited medical evidence does not contradict her statements.  ECF No. 16 at 39–43.

I am obligated to determine whether the ALJ applied the correct legal standard and whether her findings are supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (noting that judges "will not upset such determinations when supported by substantial evidence" while concluding that "some of the reasons advanced by the ALJ for finding plaintiff's subjective complaints of pain incredible were not supported by substantial evidence"); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  In examining the ALJ's conclusions, I will not "reweigh the evidence" but rather assess whether the conclusions are reasonable under the relevant standard.  *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014).

The ALJ found that Ms. Grimm's statements were undermined by her September of 2014 score of 29/30 on a mini mental status score1; Dr. Soffer's finding that at that visit, Ms. Grimm was alert, fluent, and normally conversant; and Dr. Soffer's finding a month later that Ms. Grimm had normal strength, sensation, reflexes, gait, and rapid movements.  R. 26.  Ms. Grimm correctly points out that all these conclusions were drawn in a two-month period in 2014, and

that they do not reflect much of the evidence in the record. ECF No. 16 at 39–40. However, because the evidence could reasonably impact the ALJ's assessment of the severity and persistence of Ms. Grimm's symptoms, I affirm the finding.

The ALJ also found that Ms. Grimm's statements were inconsistent with Dr. Helffenstein's finding that she had a full-scale IQ score of 102, "which falls in the average range." R. 26. Ms. Grimm points out that during the same testing session, she was found to have a "clear pattern of executive dysfunction." R. 962. Dr. Helffenstein also stated that her working memory and processing speed fell "far below expectations" given her verbal comprehension and perceptual reasoning scores, one of several "very clear indicators of organic mental dysfunction/brain injury." R. 962–63. Further, I cannot see, and the ALJ does not explain, how Ms. Grimm's IQ score is inconsistent with Ms. Grimm's statements about her impairments. Defendant has not defended this finding, and therefore I conclude it is unsupported by substantial evidence.

The ALJ found that Ms. Grimm's "activities of daily living are greater than one would expect of a fully disabled individual." R. 26. The ALJ drew this conclusion in reliance on Ms. Grimm's December of 2014 report that she performed some administrative tasks to help friends; that she was able to attend a holiday party in December of 2015; and that she was able to travel to Minnesota in August of 2016. Ms. Grimm points out that though she did successfully do these activities, she also reported that all these experiences "overstimulated her," increased her symptoms, and required her to rest extensively in the days following these activities. For example, during Ms. Grimm's trip to Minnesota, Ms. Grimm required wheelchair assistance through the airport and wore dark glasses, a hat, and earplugs throughout her journey. R. 980. Once she arrived in Minnesota, she slept for 13 hours a day. ECF No. 16 at 41. Neither the ALJ

nor the defendant explains how this evidence contradicts Ms. Grimm's statements.  In fact, I find this evidence supportive of Ms. Grimm's reported limitations, indicating how taxing daily activities could be for Ms. Grimm.  As such, I conclude the ALJ's finding is unsupported by substantial evidence.

The ALJ also supported her conclusion with evidence that in January 2015, Ms. Grimm reported that her ability to perform daily activities had improved and that she had engaged in light exercise, cooking, and housework.  R. 26.  Ms. Grimm points out that these activities were all performed under the supervision of either her husband or her home health aid.  ECF No. 16 at 43.  I agree with Ms. Grimm that this evidence could not reasonably be taken to support a conclusion that Ms. Grimm can perform these activities regularly or by herself.  However, I do find that the evidence could support the ALJ's conclusion that Ms. Grimm's symptoms were improving.  Within these constraints, I affirm the finding.

The ALJ also cites Ms. Grimm's 2014, 2016, and 2017 reports to various medical providers that she was feeling better or was happy with her progress.  R. 26.  Ms. Grimm correctly notes that despite these isolated incidents, the record is littered with incidents in which Ms. Grimm expressed distress at her lack of progress, depression regarding her conditions, and worsening or stagnating symptoms.  *See* R. 950; 349; 355; 422; 476; 973; 578, etc.  Of course, the ALJ could consider these findings of improvement when assessing Ms. Grimm's limitations.  However, the ALJ interpreted these reports as inconsistent with Ms. Grimm's statements.  The substantial evidence in the record of Ms. Grimm's repeated contrary reports does not support this conclusion.

## B.  **Weight of Opinions**

Ms. Grimm argues that the ALJ improperly ignored the "probative statements" of third-party sources including the opinions of Savannah Owen, Ms. Grimm's case manager at Larimer County Department of Human Services; Alexandra Brockhagen, Ms. Grimm's home health aid; and Dori Chacho, one of Ms. Grimm's nannies.  ECF No. 16 at 47.  She also argues that the ALJ improperly weighted the opinion of her treating providers, Dr. Wallace, Dr. Helffenstein, and Dr. Hellerstein, which she argues were entitled to controlling weight.  She further argues that the ALJ should have assigned less weight to the opinions of the non-examining state agency sources.  ECF No. 16 at 50–51.

### 1.  Third-Party Sources

Ms. Grimm argues that the ALJ improperly rejected the opinions of her Larimer County case manager, Savannah Owens, her Medicaid-sponsored home health aid, Alexandra Brockhagem, and her nanny, Dori Chacho.  ECF NO. 16 at 47.  However, as Ms. Grimm notes, the ALJ gave all of these opinions "some weight" as third-party non-medical sources consistent with 20 C.F.R. §404.1513(d)(4).  R. 28–29.  The ALJ did not reject the opinions outright but instead concluded that they were entitled to some, but not great, weight due to some inconsistencies with other evidence.  Because the ALJ provided specific and legitimate reasons for her decision, it is supported by substantial evidence, and it complies with § 404.1527(f), I affirm the finding.

### 2.  Treating Providers

In the Tenth Circuit, the opinion of a treating physician is entitled to controlling weight if it "is supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in the record." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (quoting *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)) (internal quotations omitted). "An ALJ may decline to give controlling weight to the opinion of a treating physician where he articulates specific, legitimate reasons for his decision." *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (quoting *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008)) (internal quotations omitted).

a. <u>Dr. Wallace's Opinion</u>

Dr. Bethany Wallace provided an opinion that Ms. Grimm "was limited to sedentary work and needed the ability to change positions." R. 27. The ALJ afforded Dr. Wallace's opinion "little weight" because she concluded "evidence of record indicates that the claimant is not as limited as Dr. Wallace opined." *Id*. The ALJ cited Ms. Grimm's normal strength, sensation, reflexes, gait, and finger to nose alternating movements; three instances over three years in which Ms. Grimm reported improvements in her conditions, and Ms. Grimm's hitting softballs in a batting cage once in 2015.

Though there is evidence supporting Dr. Wallace's opinion, the ALJ provided specific and legitimate reasons for assigning little weight to some of Dr. Wallace's opinions. She cites inconsistencies between Dr. Wallace's conclusion and other medical evidence regarding Ms. Grimm's limitations. She also explains the way in which the evidence contradicts Dr. Wallace's opinion, namely that it shows Ms. Grimm is less limited than Dr. Wallace suggests. Because I do not weigh the evidence, but merely examine the record for substantial evidence in support of her decision, I affirm the ALJ's opinions here.

###### b. Dr. Helffenstein's Opinion

Dr. Dennis Helffenstein also provided an opinion that Ms. Grimm's "vocational functioning had been significantly compromised by the accident and that she may be totally and permanently disabled." R. 968. The ALJ concluded that this opinion was inconsistent with evidence in the record. R. 27. Specifically, the ALJ cited Dr. Soffer's 2014 findings that Ms. Grimm was alert, fluent, and normally conversant, her score on the mini mental status exam, her self-reported improvements, her IQ test (performed by Dr. Helffenstein), and her planning of her daughter's birthday party. *Id*. The ALJ also rejected Dr. Helffenstein's opinion on the issue of disability which "is reserved to the commissioner." *Id*.

The issue of disability is reserved for the commissioner. § 416.927(d). However, this does not provide the ALJ justification to ignore the rest of the provider's opinion. Insofar as Dr. Helffenstein's opinion provides opinions other than on the issue of disability, the ALJ must either consider the opinion or provide "specific, legitimate reasons" for discounting it. *Raymond*, 621 F.3d at 1272. Dr. Helffenstein does express other medical opinions, such as his conclusion that Ms. Grimm had reached "maximum medical improvement" following her accident, and that her deficits found in 2016 "are considered to be permanent." R. 967. As discussed below, Dr. Helffenstein also provided extensive testing and opinions related to the severity of Ms. Grimm's neuropsychological impairments.

The ALJ did not provide specific and legitimate reasons for dismissing these opinions. The ALJ does not explain why Dr. Soffer's finding during one visit that Ms. Grimm was alert, fluent and normally conversant could contradict or outweigh Dr. Helffenstein's well-supported and extensive conclusions. Similarly, Dr. Helffenstein conducted Ms. Grimm's IQ test, on

which the ALJ repeatedly relies. Her IQ score on the WAIS-IV test was just one of many scores and tests Dr. Helffenstein employed to form his opinion. *See* R. 955–69. After the extensive testing that took place over several days, Dr. Helffenstein noted that Ms. Grimm's

> performance on three of the four indexes used as a measure of generalized cognitive functioning were in the impaired range. There were three clear indicators of organic mental dysfunctions/brain injury in her WAIS-IV testing. She demonstrated specific neuropsychological deficits, inconsistencies, or relative weaknesses suggestive of multifocal cerebral dysfunction. She demonstrated deficits suggestive of dysfunction in the bilateral frontal, bilateral temporal, and right parietal regions of the brain.

R. 967. Dr. Helffenstein's opinion was supported by significant medical evidence. Nor do Ms. Grimm's reports of some generalized improvement truly contradict Dr. Helffenstein's medical opinion that her neuropsychological improvement had peaked two years following her accident. R. 967. "Although we may not second-guess an ALJ's credibility judgments, such judgment by themselves do not carry the day and override the medical opinion of a treating physician that is supported by the record." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (internal quotations omitted). Because the decision is deficient in its treatment of Dr. Helffenstein's opinion, I reverse and remand for a proper analysis. *Knight ex rel. P.K.*, 756 F.3d at 1177.

c. Dr. Hellerstein's Opinion

Dr. Lynn Hellerstein also provided an opinion that Ms. Grimm had "made progress but was still a ways from being functional to drive, read, and work." R. 28. The ALJ gave this opinion little weight, concluding that "evidence of record [was] not consistent with Dr. Hellerstein's opinion." *Id*. She cites Ms. Grimm's improved visual field testing, headaches, and balance problems. She also cites Ms. Grimm's attendance of only two visual therapy sessions. *Id*.

As with Dr. Wallace's opinion, though there is evidence that supports Dr. Hellerstein's opinion, there is also evidence supporting the ALJ's conclusions. The ALJ has also provided specific, legitimate reasons, that show how Dr. Hellerstein's opinion is inconsistent with some evidence. Because substantial evidence supports the ALJ's conclusion, I affirm it.

### 3. State Agency Sources

Ms. Grimm argues that the ALJ improperly weighed the opinions of the state agencies consultants. ECF No. 16 at 51. She claims their opinions were not entitled to the great weight the ALJ gave them because neither consultant examined her, nor, according to Ms. Grimm, did they have complete evidence for their evaluations.

Ms. Grimm is correct that the ALJ should generally give greater weight to an examining source than a non-examining source. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Additionally, the Tenth Circuit has held that "the opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing *Williams v. Bowen*, 844 F.2d 748, 757 (10th Cir. 1988) and Soc. Sec. R. 96–6p, 1996 WL 374180, at *2) (internal quotations omitted). "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Id.* (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2); Soc. Sec. R. 96–6p, 1996 WL 374180, at *2) (internal quotations omitted).

So far, I have upheld the ALJ's decisions regarding the weight she gave to various opinions except regarding treating provider Dr. Helffenstein's opinion, which I found she improperly discounted. I now find that the ALJ improperly assigned more weight to the non-examining state agency consultant opinions than to Ms. Grimm's treating provider Dr. Helffenstein. "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations.'" *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir.2003) (quoting 20 C.F.R. § 416.927(d)(2)). Thus, I remand the case for consideration of medical sources in line with this opinion.

**C. Step Three Errors**

The ALJ concluded that Ms. Grimm's impairments did not meet or medically equal a listing. R. 20. Ms. Grimm claims that based on the evidence, the ALJ should have found that her impairments meet or medically equal Listings 12.02, 12.04, 12.06, or 12.15. ECF No. 16 at 44.

The claimant bears the burden of showing that the impairment meets or medically equals a listing. 20 C.F.R. § 404.1520. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). An impairment is "equivalent" to a listed impairment if there are medical findings "at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926.

1. Listings 12.02, 12.04, 12.06 B Criteria

The ALJ acknowledged that Ms. Grimm met the Part A criteria for Listings 12.02, 12.04, and 12.06, but concluded she did not meet the B or C criteria for these listings. R. 20. To satisfy the B criteria, Ms. Grimm's mental impairments must result in at least one extreme or two

marked limitations in either understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02; § 12.04; § 12.06. A marked limitation means that the claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. R. 20. An extreme limitation is the inability to function independently, appropriately, or effectively, and on sustained basis. *Id*.

The ALJ concluded that Ms. Grimm had a mild limitation in understanding, remembering, or applying information. *Id*. She found that though Ms. Grimm stated she had difficulty with memory and understanding, Dr. Soffer's note that she was alert, fluent, and normally conversant, her mini mental status exam score, her reported memory improvement, her IQ score, and her ability to plan her daughter's birthday party suggest otherwise. R. 20–21.

I find this conclusion unsupported by substantial evidence. The ALJ points to a very limited collection of test results, provider observations and Ms. Grimm's statements. In doing so, she ignored the wide range of other test results, provider observations, third-party source observations, and Ms. Grimm's statements that support a finding that Ms. Grimm has at least a marked limitation if not a severe one in this area. For example, in reaching this conclusion the ALJ cited Dr. Soffer's finding that Ms. Grimm was alert, fluent, and normally conversant during one visit. She ignores Dr. Soffer's note that during the same visit, Ms. Grimm reported memory loss and cognitive difficulty. R. 314–16.

The ALJ also focused on Ms. Grimm's IQ score while ignoring the many other subset scores and tests Dr. Helffenstein performed which strongly suggest significant memory impairment. *See* R. 955–69. Ms. Grimm's WAIS-IV showed average IQ, but subset scores on working memory showed mild impairment, subset scores on processing speed showed mild to

moderate impairment, and general results showed a "clear pattern of executive dysfunction." R. 959– 63. Ms. Grimm's Story Memory Test showed moderate to severe impairment, at "less than the 1st percentile," and her "four-hour recall score was moderately to severely impaired, at less than the 1st percentile." R. 963. At this visit, Dr. Helffenstein also noted that because Ms. Grimm's accident had occurred two years prior, "she has therefore reached the maximum medical improvement from a neuropsychological standpoint and the deficits noted on testing are considered to be permanent." R. 967.

Tests conducted by speech-language pathologist Susan Tauger showed that though Ms. Grimm's ability to repeat three-word strings was within normal limits, her delayed recall of three words was severely impaired at 33% accuracy, her immediate recall of five words was mildly impaired, her delayed recall of five words was severely impaired, and her recall of targeted words was severely impaired. R. 943. The tests showed she had severely impaired long-term and working memory and "very significant, often severe, functional processing and expressive language impairments." R. 943–45. The Gardner Test of Visual Perceptual Skills found Ms. Grimm's memory and sequential memory in the first percentile or lower, at a "kindergarten grade level." R. 893. Medical providers' extensive findings about Ms. Grimm's impairments in remembering and understanding strongly contradict the ALJ's conclusion.

Reports from and third-party sources, as well as Ms. Grimm's own statements, also contradict the ALJ's conclusion. Ms. Grimm's state services case manager reported that Ms. Grimm requires "prompting and direction" in order to complete most daily activities, and that she was not changing clothes, showering, or eating well due to her cognitive limitations, and that without in home care, Ms. Grimm would be "at high risk for hospitalization or skilled nursing facility placement.". R. 251. Ms. Grimm and her family members repeatedly reported difficulty

remembering things, including things she has said, done, or intended to do, to the extent that she had to write herself notes, including every step she had taken while preparing food, and make many copies of her house keys to leave places for herself.  R. 957; 966; 262; 314; 623.

The defendant argues that this finding should be upheld because it is supported by substantial evidence, including "in-depth neurocognitive testing, which showed no more than moderate limitations."  ECF No. 17 at 7.  This is incorrect.  As noted above, Ms. Grimm's treating providers found severe limitations in multiple areas, including her four-hour recall, R. 963, long term and working memory, R. 943–45.

The ALJ then concluded that Ms. Grimm had a mild limitation in adapting or managing oneself.  She also found Ms. Grimm had moderate limitations in interacting with others, and concentrating, persisting, and maintaining pace.  R. 21.  The ALJ based these conclusions primarily on Ms. Grimm's reported improvements in her ability to perform daily tasks and exercise, her performance on the mini mental status exam, her IQ score, and Dr. Soffer's 2014 conclusion that she was alert, fluent, and normally conversant.  *Id*.

I find these conclusions supported by substantial evidence in the record.  The findings of moderate limitations in both interacting with others, and concentrating, persisting, or maintaining pace, comport with the opinions of Ms. Grimm's medical providers who found similar limitations.  R. 942 (noting mild and moderate impairments sustaining attention); R. 960 (finding mild impairment of attention, concentration).  Though the ALJ improperly discounted Ms. Grimm's statements, the conclusions are not against the weight of other evidence and therefore should be upheld.

However, I cannot uphold the ALJ's conclusion that Ms. Grimm's limitation in understanding, remembering, or applying information is only mild.  That said, I cannot conclude

whether her limitation is marked or severe. If her limitation is severe, which it very well might be, she would meet the criteria for these listings. On remand, the ALJ should consider whether this limitation is marked or severe. Additionally, if the ALJ reaches step four, I would hope the ALJ would consider the severity of this impairment when calculating Ms. Grimm's RFC, which currently includes the ability to "understand, remember, and carry out simple and routine tasks." R. 22.

### 2. Listings 12.02, 12.04, 12.06 C Criteria

To satisfy the C criteria, Ms. Grimm must have a "serious and persistent" mental disorder. § 12.02; § 12.04; § 12.06. She must also show evidence of both ongoing medical treatment that diminished the symptoms and signs of the disorder, and "marginal adjustment," meaning "minimal capacity to adapt to changes in your environment or to demands" not already part of her daily life. *Id*.

The ALJ concluded that Ms. Grimm did not meet criteria because she had experienced more than a marginal adjustment in her condition. R. 21. She supported this finding with evidence of Ms. Grimm's improvement since her accident, including her self-reported increase in reading performance, comprehension and recall of information, as well as her planning of her daughter's birthday party in 2017. Because the ALJ has provided support for her finding, which is not contradicted by the weight of evidence in the record, I affirm the conclusion.

### 3. Listing 12.15

The ALJ did not consider listing 12.15. Ms. Grimm argues that she should have done so. It seems likely that Ms. Grimm would have met the Part A criteria of Listing 12.15 (medical documentation of: exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of traumatic events; avoidance of external reminders of the event;

disturbance in mood and behavior; increases in arousal and reactivity). However, the B and C criteria are identical to those for Listings 12.02, 12.04, and 12.06. Above, I upheld that ALJ's conclusions regarding those criteria except with regard to her finding that Ms. Grimm had only a mild limitation understanding, remembering, or applying information. As such, on remand the ALJ need only consider whether she meets the A criteria and whether her limitation in understanding, remembering or applying information is extreme such that she meets Listing 12.15.

### D.  Step Four Errors

Ms. Grimm claims the RFC determination did not include some of her limitations, including her "severe vision impairments," as well as limitations relating to her carpel tunnel and thoracic outlet syndromes. ECF No. 16 at 52–53. At step four, the ALJ must consider limitations related to all impairments. 20 C.F.R. §416.945(e) ("We will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). *See also Wells v. Colvin*, 727 F.3d 1061 (10th Cir. 2013).

In her calculation of Ms. Grimm's RFC, the ALJ included the limitation that Ms. Grimm would need to wear dark glasses in brightly lit spaces. R. 22. Ms. Grimm argues that her brain injury caused much more severe visual limitations. The record reflects significant visual impairments. Dr. Hellerstein, a neuro-optometrist, found Ms. Grimm showed eye movement control difficulty, difficulty perceiving visual information, functional tunnel vision, and decreased visual fluency, with only 70% comprehension. R. 893–94. She was diagnosed with photophobia, constricted visual fields, convergence insufficiency, suppression of binocular vision, accommodative insufficiency, vision/motor sensitivity, mildly reduced visual acuity in

the left eye, and spasms and pain with ocular movement.  R. 894.  Dr. Stieg found she had

transient upbeat nystagmus in both eyes and slight oscillopsia.  R. 870.

Defendant argues that the ALJ accounted for these impairments when she limited Ms.

Grimm to "simple, routine tasks and work that involved no exposure to moving machinery,

hazards, or heights."  ECF No. 17 at 9.  However, nowhere in the ALJ's opinion can I find any

indication that she considered these visual impairments.  R. 19–31.  Defendant's argument that

the ALJ implicitly included Ms. Grimm's visual limitations in her RFC calculation cannot stand.

I can only affirm the ALJ's conclusions on the findings she made explicit.  And the defendant

cannot supply a post-hoc rationalization for the ALJ's failure to make explicit findings.  *See*

*Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) ("[T]he agency would inherently be

offering a new, post-hoc rationale for its decision contrary to the general rule of *SEC v. Chenery*

*Corp.*, 318 U.S. 80, 94–95 (1943).");  *see also Russ v. Colvin*, 67 F. Supp. 3d 1274, 1279 (D.

Colo. 2014) ("Commissioner's attempts, post hoc, to fill in the blanks on the ALJ's behalf are

improper as well.") (citing *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005)).  It

appears the ALJ erred in failing to consider these impairments in her RFC calculation.

Ms. Grimm also argues that the ALJ failed to include "reasonable limitations in the RFC

to account for Ms. Grimm's carpel tunnel syndrome and thoracic outlet syndromes."  ECF No.

16 at 52–53.  However, as defendant points out, Ms. Grimm has not articulated what limitations

or impairments the ALJ should have considered and did not.  Ms. Grimm suggests that these

conditions effect "her ability to use her upper extremities effectively."  *Id*.  However, without

more, I do not see what the ALJ could have reasonably evaluated.  The ALJ did consider Ms.

Grimm's strength, grip, sensation, and Tinel's sign (which tests for carpel tunnel syndrome)

when evaluating her RFC.  R. 24–25.  Thus I conclude the ALJ's decision was supported by substantial evidence.

The ALJ's RFC calculation deserves deference.  However, because it does not appear that the ALJ has accounted for all of Ms. Grimm's visual impairments, I must remand for new analysis that includes her visual impairments.

### E.  Step Five Errors

Ms. Grimm claims that the occupations cited by the ALJ cannot be performed within the limitations the ALJ gave in her RFC.  To identify occupations, the ALJ relied on testimony of a vocational expert who concluded that based on her RFC, Ms. Grimm could perform the occupations of "marker," "housekeeping cleaner," and "mail clerk."  R. 30.  SSR 00-4p requires the ALJ to identify and explain conflicts between the vocational expert's opinion and the Dictionary of Occupational Titles ("DOT"), which describes the requirements of the positions. 2000 WL 1898704.  However, the ALJ need not explain "all implicit conflicts" between the DOT and the vocational expert opinion, but rather address only those that are "apparent." *Segovia v. Astrue*, 226 F. App'x 801, 804 (10th Cir. 2007) (unpublished); SSR 00-4p, 2000 WL 1898704.

Ms. Grimm points out that according to the DOT, the position of "mail clerk" requires a reasoning level of three.  1991 WL 671813.  Ms. Grimm argues these requirements are inconsistent with her RFC to perform only "simple and routine tasks."  R. 22. The Tenth Circuit has held that a limitation to simple and routine tasks is "inconsistent with the demands of level-three reasoning." *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997)).  Defendant does not defend this error, and I find the

ALJ's conclusion that Ms. Grimm could perform the occupation of mail clerk unsupported by substantial evidence.

Ms. Grimm also points out that the DOT states that "marker" requires a reasoning level of two and the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." 1991 WL 671802. She argues that "detailed" instructions are inconsistent with her limitation of performing only "simple and routine tasks." ECF No. 16 at 54. However, *Hackett*, which Ms. Grimm relies on above, specifically concluded that "level-two reasoning appears more consistent with Plaintiff's RFC" limiting him to "simple and routine work tasks." 395 F.3d at 1176. Thus I find the ALJ's conclusion that Ms. Grimm could perform the occupation of marker supported by substantial evidence.

Ms. Grimm argues that because her RFC limits her to "occasional interaction with co-workers and the public" she cannot perform the requirements of housekeeping cleaner which involves providing "personal assistance to patrons." ECF No. 16 at 54. Though there seems to be an implicit conflict here, it is not so apparent that the ALJ's decision is unsupported by substantial evidence.

I conclude that the ALJ's step five decision was supported by the RFC she calculated. However, for the reasons described above, I found the RFC to have been improperly calculated. Thus, upon remand, the RFC will need to be recalculated and Ms. Grimm's ability to perform these occupations reassessed in light of this opinion.

## ORDER

For the reasons described above, the Court REVERSES the Commissioner's decision denying Ms. Grimm's application for SSDI and REMANDS for reevaluation of the evidence consistent with this order.

DATED this 25th day of November, 2019.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge